THE CITY OF AURORA *et al.*

*v.*

THE ELGIN, AURORA AND SOUTHERN TRACTION CO. *et al.*

*Opinion filed February 21, 1907—Rehearing denied June 15, 1907.*

1. STREET RAILWAYS—*fundamental purpose of street railway is to accommodate street travel.* The fundamental purpose of a street railway is to accommodate street travel, and not travel to or from points beyond the city's limits.

2. SAME—*ordinance granting right to operate street railway is construed strictly against the company.* An ordinance granting the privilege to a street railway company to lay its tracks and operate its cars in a city is construed most strongly against the street railway company, and passes no rights by mere implication but only those unequivocally granted.

3. SAME—*when a street railway company cannot contract to transport interurban cars.* A corporation authorized by its license and charter only to operate street cars and carry passengers in the streets of a city cannot confer its privileges upon an interurban railroad having no authority from the city to use its streets, by contracting with the interurban company to transport the cars of the latter, with their passengers, freight, express, baggage or mail, through the streets of the city.

4. SAME—*what does not aid a contract between street railway company and interurban.* The fact that an operating contract between a street railway company and an interurban company provides that employees of the latter, when running interurban cars on the street railway company's line, shall be considered as the employees of the street railway company although paid by the interurban company, has no effect to render the contract valid.

5. SAME—*when sections 44 and 45 of Railroad act do not apply.* Sections 44 and 45 of the Railroad act, providing that railroad companies shall have power to make contracts with each other for leasing their roads, or any part thereof, do not apply to a contract between a street railway company and an interurban company organized under the general Railroad act, whereby the street railway company agrees to haul the cars of the interurban company over streets of a city the latter has no license to enter.

6. INTERURBAN RAILROADS—*interurban cannot enter city except upon city's terms.* An interurban railroad has no right to enter the streets of a city without first obtaining a license from the city, and the latter has power to impose such reasonable restrictions as it may deem proper in granting the use of the public streets.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Kane county; the Hon. L. C. RUTH, Judge, presiding.

On the 5th day of September, 1890, the city of Aurora adopted an ordinance authorizing the Aurora Street Railway Company to construct, operate and maintain a street railway in certain streets of the city. The grant in section 1 is to operate and maintain "a street railway." In other sections of the ordinance the manner in which the railway is to be constructed in the streets is prescribed, the use of steam as a motive power is prohibited, electricity is authorized to be used, the rate of speed is fixed, and it is provided that the cars authorized to be propelled along the tracks shall be run at intervals not exceeding twenty minutes; and in section 16 the ordinance provides that said railway, and the grant thereby made, shall be subject to the provisions and conditions contained in an act of the General Assembly of the State of Illinois entitled "An act in regard to horse and dummy railroads," approved March 19, 1874.

On May 7, 1898, the city of Aurora adopted an ordinance granting to H. H. Evans, his heirs, administrators and assigns, authority to operate a "street car line" or street railway in and along certain streets of the city of Aurora, with provisions substantially as those of the ordinance of September 5, 1890.

The appellee the Elgin, Aurora and Southern Traction Company, (which will be hereinafter called the "Aurora company,") as the remote or direct assignee of the Aurora Street Railway Company and of said H. H. Evans, was on the 5th day of August, 1904, and for some years before that time had been, engaged in operating street railway cars for the conveyance of passengers from point to point in the city along tracks which had been laid in the streets of Aurora in pursuance of the provisions of these ordinances. One of these lines of street railway extended from the eastern limits

of the city of Aurora in and along Parker avenue, Fifth street, Clark street, Lincoln avenue, Spring street, Broadway and Benton street to the transfer station and power house of the Aurora company at the corner of Benton and Water streets. The line is known as the Fifth street line, and will hereinafter be so designated. Authority to operate its street cars on some of the streets above named, comprising the Fifth street line, is based on the ordinance conferring rights upon the Aurora Street Railway Company, and as to other of such streets the authority rests on the ordinance granting a license to H. H. Evans. The Aurora company is also engaged in the operation of interurban lines, but its only authority from the city to operate the Fifth street line is derived from the Evans and Aurora Street Railway ordinances.

At this time the appellee the Joliet, Plainfield and Aurora Railroad Company (hereinafter called the "Joliet company") was engaged in operating an interurban electric railway for the conveyance of passengers, mail, express "and other matter" from the city of Joliet to the eastern city limits of the city of Aurora, at the point where the Fifth street line of the Aurora company street car system reached the said eastern limits of the city of Aurora. The Joliet company was without right to pass within the city's boundaries.

The Aurora company was organized under the general Corporation act, and is subject to the provisions of the statute in reference to horse and dummy railroads. The Joliet company was incorporated under the statute providing for the organization of railroad companies.

On said 5th day of August, 1904, the said Aurora company and said Joliet company signed a written instrument consisting of a preamble and a contract between the companies. The preamble, in part, after reciting the fact that the Fifth street line of the Aurora company's street car system and the line of the Joliet company's interurban railway practically connected at the eastern limits of the city of Aurora,

declared that the two companies, being mutually desirous that passengers coming on the cars of the Joliet company should be carried from the point of connection into the city of Aurora by the Aurora company, and in order to avoid the transfer of passengers from the cars of the interurban road to the street cars of the Aurora company, find it mutually desirable that the Aurora company should lease the cars of the Joliet company wherein to convey the passengers coming in on the interurban cars to points along said Fifth street car line and to convey passengers from points along said Fifth street car line to the point of connection at the city limits of the two companies, and further, "it is mutually desirable that said Aurora company shall carry to and from said point of connection aforesaid, express, mail or other matter destined to or from points on the lines of said Joliet company, so far as it shall be able to do under municipal or statutory ordinances or regulations."

Following this preamble are certain covenants and agreements of the respective companies, set forth in thirteen clauses of the instrument. Clauses 1 and 2 of said contract are as follows:

"*First*—That the Aurora company shall, during its regular hours of operation, carry and convey all passengers of the Joliet company brought by it to the point of connection aforesaid, from said point of connection and over and along said Fifth street line of its railway to the transfer station maintained by said Aurora company for the use of its interurban cars, on the east side of Fox river, in Aurora, Illinois, and also covenants and agrees to carry passengers, during such regular hours of operation, destined to points on the lines of railway of said Joliet company, from said transfer station for interurban cars aforesaid to said connecting point, and the Aurora company also covenants and agrees to in like manner carry and convey, so far as it is able to do so under municipal and statutory ordinances and regulations, express, mail or other matter destined to or from points on the lines

of railway of the said Joliet company over the said Fifth street line, and the said Aurora company shall have the right to use, and the Joliet company hereby leases to the Aurora company, the cars of the said Joliet company necessary for such service and traffic; and this lease and agreement shall extend for the term and. continue in force and operation during the existence of present ordinances, or of any renewal or renewals thereof, granting rights to said Aurora company to operate upon the streets forming a part of the route known as the Fifth street line, as above set forth, and so long as. said Aurora company shall continue to operate over said line, and shall be binding upon the successors, lessees and assigns of both parties, and shall be a covenant and agreement running with the properties of the parties hereto; and during all said period said Joliet company, and its successors and assigns, shall not ask for, obtain or use any grant in the city of Aurora, Illinois, or obtain or use any rights from any other company or corporation, to operate its cars within the limits of the said city of Aurora, Illinois, without the consent of the Aurora company; and nothing herein contained shall allow or permit of the bringing into the city of Aurora any current of electricity or other operative force by the Joliet company.

"*Second*—The said Aurora company shall have the right to take the cars of the Joliet company at the point of connection aforesaid and to use the same for the purposes aforesaid; and said Joliet company shall furnish the necessary men and employees to man said cars and to operate the same from said point of connection to said transfer station and back to said point of connection aforesaid; and said employees, while operating said cars for said Aurora company over its lines, shall be considered, and are made by this lease and contract, the employees of said Aurora company, and they shall be subject in all things to its regulations, rules and directions, but all of said employees shall be paid by said Joliet company and shall be furnished by it to said Aurora com-

pany without charge or expense to it; and said cars, while upon the tracks of the Aurora company, shall be considered as, and are under the terms of this lease, cars of the Aurora company and operated by it; and the said Aurora company shall receive as compensation for the carrying of said passengers aforesaid two and one-half (2½) cents for every paying passenger over six (6) years of age carried in the cars of the Joliet company over any part of the tracks of the Aurora company and destined to or from any point upon the lines of railway of the Joliet company; but in case the Aurora company shall be required by any future municipal regulation to carry children above six (6) years of age at a rate of fare within the city limits of Aurora less than five (5) cents, then the Aurora company shall only be entitled to receive from the Joliet company an amount equal to one-half of such reduced fare for each such passenger destined to or from any point upon the lines of railway of the Joliet company."

Clause 3, after setting forth certain agreements relating to fares collected from passengers, provides that "a full and true account of all express, mail or other matter carried by the Aurora company over any parts of the lines of the Aurora company and taken from or turned over to the Joliet company shall be kept by the Joliet company, and the Joliet company shall pay to the Aurora company ten per cent (10%) of the entire gross amount received for carrying such express, mail or other matter, in either direction, between any point in the city of Aurora and any point on the line or lines of the Joliet company: *Provided, however,* that so much of this section as applies to the rate to be paid by the Joliet company to the Aurora company for such express, mail or other matter shall be subject to revision after five (5) years from the date hereof."

Clause 5 contains the following provision: "The Aurora company shall have the right to verify, by a system of inspection or otherwise, the reports as to the number and classes of passengers carried and transfers issued, the amount of

express, baggage, mail and other matter carried and the amount received therefor, and other matters pertaining to that portion of the earnings of the Joliet company in which the Aurora company has an interest, the expense of such inspection or other system of verification to be borne equally by the parties hereto. The Joliet company shall pay to the Aurora company, from the moneys received by it for the sale of the privilege of placing advertising matter in its cars, an amount bearing one-half the proportion of the whole amount so received by it that the length of track of the Aurora company bears to the entire length of the track of the Joliet company, from the city limits of Joliet to the city limits of Aurora."

Clauses 8, 9, 10 and 13 are as follows:

"*Eighth*—The cars furnished by the Joliet company to the Aurora company shall not exceed nine feet one inch in width, extreme out to out, nor sixty thousand (60,000) pounds in weight, including motors, when double-truck cars are to be used, and where single-truck cars are to be used, the weight thereof, including motors, shall not exceed twenty-two thousand five hundred (22,500) pounds. The gauge of all trucks shall be four feet and eight and one-half inches, and the flanges of the wheels shall not exceed one inch in depth, if by reason of greater depth such flanges shall run on any portion of the rails or special work of the Aurora company, and the tread of said wheels shall not exceed three inches in width.

"*Ninth*—The Aurora company is not to be held liable to the Joliet company for any damage or injury which the Joliet company may suffer by reason of the breakage of its lines or injury to its tracks or bridges, or for any damages or injuries not purposely or maliciously caused by the Aurora company.

"*Tenth*—The Joliet company shall hold the Aurora company harmless from any and all claims for damages made by any person or corporation for injuries or damages of any

kind occurring on the tracks of the Aurora company or adjacent thereto, caused by reason, either directly or indirectly, by the use or manner of use and operation of the Joliet company's cars over said lines; and in case suit shall be brought against the Aurora company on any such claims, the Aurora company shall, at its option, defend such suit, and the Joliet company shall pay all expenses incurred and damages and costs awarded against the Aurora company in any such suit or suits.

"*Thirteenth*—The Joliet company shall bear and pay one-third (⅓) of the expense incurred by the Aurora company in the maintenance of a combination express station and passenger depot in the city of Aurora, Illinois, but such payment shall not exceed twenty-five (25) dollars per month. The word 'maintenance,' as used in this paragraph, shall be defined to mean rental, light, heat, janitor service and such other expenses incidental to the operation of said station: *Provided,* that each company shall pay the salaries of such clerks, agents and attendants as may be separately employed for the conduct of its business. The above provision is subject to revision at the request of either party hereto after the expiration of five (5) years from date."

Shortly after this contract was executed the parties thereto entered upon the performance thereof.

On the 5th day of September, 1904, a resolution was adopted by the city council of the city of Aurora instructing the mayor to take necessary and proper steps to prevent the Aurora company and the Joliet company from carrying into execution the undertaking set forth in said contract.

The appellee companies, parties to the last mentioned contract, on October 20, 1904, filed their bill in chancery in the circuit court of Kane county, seting forth, in substance, their purpose to do the things the contract provided should be done, and stating further that in pursuance of the resolution above mentioned the officers and agents of the city council of the city of Aurora had threatened to "obstruct and stop by force

the passage of the cars of the Joliet company in and along the street railway tracks in the streets of the city," and praying for an injunction restraining said city, its officers and agents, from interfering with the operation of the cars of the Joliet company on the street railways of that city.

A temporary injunction was issued as prayed. Subsequently the appellants, the city of Aurora and the mayor of the city, filed their answer to the bill, setting up the existence of the contract between appellee companies, and stating facts designed to show that such contract did not confer any right to operate the cars of the Joliet company within the city in the absence of permission from the city. To this answer seven exceptions were exhibited and were sustained by the court. Replication was filed to the answer, the parts to which exceptions had been sustained having been excluded. A decree was entered in the trial court making the temporary injunction perpetual and permanently enjoining the city from interfering with the transportation of the cars of the Joliet company for the carriage of passengers, freight, baggage, mail and express along and over the street car tracks on said Fifth street line to and from the city limits. The Appellate Court for the Second District affirmed the decree in so far as it enjoined the city and its authorities from interfering with the transfer of the Joliet company's passenger cars which were used for passengers only over the street railway, and reversed the decree in so far as it enjoined the city and its authorities from interfering with the transfer of the Joliet company's cars containing freight, baggage, mail and express over the lines of the Aurora company. The city and the mayor appeal to this court.

E. M. MANGAN, City Attorney, and MURPHY, ALSCHULER & CLYNE, for appellants:

The city is vested by law with full and complete control within such city over all streets, alleys, public places, viaducts, pavements, street crossings and gutters, and is spe-

cifically given by statute exclusive authority to license street railways and railroads to use and occupy the same. Starr & Cur. Stat. chap. 24, sec. 63, pars. 7-29.

A grant of a license or franchise must always be strictly construed in favor of the public and against the licensee. As against the public nothing passes by implication, and that which is not unequivocally granted is withheld. *Water Power Co.* v. *Lyman,* 82 U. S. 500; *Mining Co.* v. *State,* 144 id. 550; *Townsend* v. *Brown,* 4 Zabr. 80; *Tudor* v. *Railroad Co.* 154 Ill. 129; *Goddard* v. *Railroad Co.* 202 id. 362; *Railroad Co.* v. *Quincy,* 139 id. 355; *Railroad Co.* v. *Chicago,* 121 id. 176; *Chester* v. *Railroad Co.* 182 id. 389.

An interurban electric railroad is a "commercial railroad" or "railroad." The following cases declare such to be the status of the interurban electric railroad: *Malott* v. *Railroad Co.* 108 Fed. Rep. 313; *Diebold* v. *Traction Co.* 63 L. R. A. 637; *Railroad Co.* v. *Railway Co.* 95 Wis. 561; *Zehren* v. *Railway Co.* 99 Wis. 83; *Goddard* v. *Railroad Co.* 202 Ill. 452; 202 id. 362; *Harvey* v. *Railway Co.* 174 id. 307; *Wilder* v. *Traction Co.* 216 id. 493.

The placing of an additional burden or servitude upon the fee of a street or highway constitutes a taking of private property and cannot be done without just compensation. Mills on Eminent Domain, sec. 32; Elliott on Roads and Streets, 306; Const. of Ill. art. 2, sec. 13.

The urban character of an interurban road while passing through the city does not give to it the character of an urban street railway. *Diebold* v. *Traction Co.* 63 L. R. A. 637; *Malott* v. *Railroad Co.* 108 Fed. Rep. 313; *Wilder* v. *Traction Co.* 216 Ill. 493.

A company that has not accepted the burdens or limitations of the Horse and Dummy act cannot claim its advantages. *Malott* v. *Railroad Co.* 108 Fed. Rep. 313; *Hartshorn* v. *Traction Co.* 210 Ill. 609.

The city has a right to sell to a private corporation, for a just and reasonable compensation, the privileges or license

to use the streets, and may also impose such conditions and limitations on the use of the same as it may see fit. *Byrne* v. *Railway Co.* 169 Ill. 75; 27 Am. & Eng. Ency. of Law, 19.

In the city the fee of the streets is in the corporation, and its dominion over them is as absolute as that of the owner of other lands. *Railroad Co.* v. *People,* 92 Ill. 170.

HOPKINS, PEFFERS & HOPKINS, for appellees:

The operating contract and lease was a contract authorized by law, and the consent of the city of Aurora was not necessary. The statute entered into and was a part of the ordinances of the city of Aurora as fully as if incorporated therein. The law enters into and forms a part of every contract. *Mayfield* v. *Gas Co.* 198.Ill. 528; *Miller* v. *Wilson,* 146 id. 523; *Barrett* v. *Boddie,* 158 id. 479.

Under the act of February 22, 1855, all railways have power to lease and make operative contracts. *Railroad Co.* v. *People,* 84 Ill. 426.

The contract involved here is simply an operating contract. *Archer* v. *Railroad Co.* 102 Ill. 493.

The statute also authorizes contracts by one company with other railway companies for selling tickets over its own and other roads. By confining the road to a simple traffic between the termini and points directly on its route, the country remote from its direct line would be benefited a very trifling degree, or not at all, if these *quasi* partnerships with other roads were not allowed. *Railroad Co.* v. *Copeland,* 24 Ill. 332.

An injunction will be granted against acts which are not only threatened but will in all probability be committed. *Telephone Co.* v. *Telephone Co.* 199 Ill. 324; *Parish* v. *Vance,* 110 Ill. App. 50.

The consent of the city or abutting owners to make operating contracts is not necessary. *Ingersoll* v. *Railroad Co.* 157 N. Y. 453.

Mr. CHIEF JUSTICE SCOTT delivered the opinion of the court:

The pleadings, with the exceptions to the answer sustained, and the proofs of the parties, properly present the questions which we regard as material in this controversy.

The authority possessed by the Aurora company under its charter and under the ordinances of the city of Aurora, as to the Fifth street line operated by that company, is authority to operate the same as a street railway only. By those ordinances street railway transportation alone is contemplated.

The chief characteristic of a street railway is, that it is built upon and passes along streets and avenues for the convenience of those moving from place to place thereon. Its fundamental purpose is to accommodate street travel, and not travel to or from points beyond the city's lines. (*Harvey* v. *Aurora and Geneva Railway Co.* 174 Ill. 295; *In re South Beach Railroad Co.* 119 N. Y. 141; *Diebold* v. *Kentucky Traction Co.* 117 Ky. 146; *Zehren* v. *Milwaukee Electric R. & L. Co.* 99 Wis. 83; *Rohn Township* v. *Street Railway Co.* 167 Pa. 84.) Commercial railroads embrace all railroads for general freight and passenger traffic between one town and another, and street railways embrace all such as are constructed and operated in the public streets for the purpose of carrying passengers with the ordinary luggage from one point to another on the street. 1 Lewis on Eminent Domain, sec. 110*a*.

The Joliet company is not a railroad organized for the purpose of operating a street railway in a city or town, but its function is that of an ordinary commercial railroad. The Aurora Street Railway Company by its charter had power to construct and operate a street railway. The only authority from the city it could claim, to operate street cars on its Fifth street line, in Aurora, was by virtue of the licenses transferred to it in the manner set forth in the foregoing statement of facts.

The Joliet company was chartered under the general Railway act, and is engaged in operating an interurban railroad between Joliet and Aurora, and it does not have authority to enter the streets of the city of Aurora without the consent of the city. It could not of its own power propel any of its cars on any of the streets of the city of Aurora without the assent of the city council of that city. The right to occupy the streets of a city with a railroad track and propel cars thereon· can only be obtained by consent of the city council, and the council may prescribe the conditions and limitations under which license to occupy its streets may be granted. The city may require the payment of compensation for the license. (*Byrne* v. *Chicago General · Railway Co.* 169 Ill. 75; *Wells* v. *Northern Trust Co.* 195 id. 288; 22 Am. & Eng. Ency. of Law,—2d ed.—22.) Such licenses are a legitimate source of city revenue.

The effect of the agreement between the Aurora company and the Joliet company, if it is enforcible, is to confer on the Joliet company authority to extend the line of its road into the streets of the city, and to propel its cars, manned by its employees who are paid out of its treasury, along the streets from the city limits to the transfer station of the Aurora company, which by the contract becomes, in effect, the depot of the Joliet company. The provision of the agreement that the employees of the Joliet company were to be deemed employees of the Aurora company while in the streets of the city though to be paid by the Joliet company, had no magical effect to convert the interurban coaches into street cars, or the passengers who were making trips from other points to Aurora, or *vice versa,* into passengers of a street car line proceeding from point to point within the city. The authority of the city of Aurora over its streets is not abrogated or at all diminished by the provisions of the contract.

The Appellate Court declared the contract did not confer lawful authority on the Joliet company to transport freight, express, baggage and mail in its cars along the street car
227—32

tracks of the city. This holding was right, because the license and charter of the Aurora company are not broad enough to authorize the Aurora company to confer power on the Joliet company to transport baggage, freight, express and mail through the streets of Aurora. We think the same reasoning ought to be given application with respect to the authority granted to the Aurora company by charter and ordinances to operate its street cars and carry passengers on the Fifth street line. That authority is not broad enough to empower the Aurora company to confer upon the Joliet company the right to transport its passenger cars and passengers over the line in question.

An ordinance granting the privilege to a street railway company to lay its tracks and operate its cars in the city is always to be strictly construed in favor of the public and against the licensee. Nothing passes by mere implication against the public, and that which is not unequivocally granted is withheld. *Holyoke Water Power Co.* v. *Lyman,* 15 Wall. 500; *Coosaw Mining Co.* v. *South Carolina,* 144 U. S. 550; *Packer* v. *S. & E. R. R. Co.* 7 Harris, 211; *People ex rel.* v. *Newton,* 112 N. Y. 396.

The license to the Aurora company cannot be assigned by it so as to invest the Joliet company with power to operate the passenger traffic of a commercial railroad or interurban railroad through the streets of the city of Aurora. The Aurora company did not, by virtue of these ordinances, obtain the right to authorize a railroad company organized to transport passengers between points outside of the city to enter the city of Aurora and transact its business in and along the streets of said city of Aurora over the lines of the street railway. The city of Aurora possesses the power and authority to determine whether interurban railroads chartered and authorized to convey passengers to the city limits shall bring their cars and passengers within the city streets and transport them on, in and along the streets to a depot in the city.

It is earnestly insisted by appellees that the contract in question is authorized by sections 44 and 45 of chapter 114, Hurd's Revised Statutes of 1905, which provide:

"Sec. 44. All railroad companies incorporated or organized under, or which may be incorporated or organized under the authority of the laws of this State, shall have power to make such contracts and arrangements with each other, and with railroad corporations of other States, for leasing or running their roads, or any part thereof; and also to contract for and hold in fee simple or otherwise, lands or buildings in this or other States for depot purposes; and also to purchase and hold such personal property as shall be necessary and convenient for carrying into effect the object of this act.

"Sec. 45. All railroad companies incorporated or organized, or which may be incorporated or organized as aforesaid, shall have the right of connecting with each other, and with the railroads of other States, on such terms as shall be mutually agreed upon by the companies interested in such connection."

In *City of Chicago* v. *Evans*, 24 Ill. 52, it was held that two horse railways might, under the quoted sections, unite their roads and make running arrangements with each other, but the fact is there pointed out that the two roads were "created for the same purpose." It also appears that both were operating in the same city, and that each had permission from the municipal authorities to operate a street railway in the streets of the city. Appellee roads were not created for the same purpose, were not operating in the same city, and but one of them had permission from the city of Aurora to engage in operating a street railway in the streets of that city. We do not think the case just referred to determines the question of their right to enter into this contract. A street railway is not an additional burden upon the street of a city, while a commercial railroad is a further burden upon such way. (*Wilder* v. *Au-*

*rora, DeKalb and Rockford Traction Co.* 216 Ill. 493.)
It follows that a street railway company may not lawfully
carry the cars of a commercial railroad for the purpose of
transporting therein the passengers of the latter over the
lines of the street railway without the permission of the city
authorities of the city in which the lines in question are lo-
cated.    If it were otherwise, the power to determine when,
where and in what manner interurban lines should enter a
city and traverse its thoroughfares with passenger traffic
would be lodged, in great part, not in the city authorities,
but in the street railway company in every city where a
street railway company is rightfully operated.

It is said, however, that the sections of the statute just
quoted entered into and became a part of the ordinances
passed by the city of Aurora under which the Aurora com-
pany now operates its street railway, and consequently, by
such ordinances, the city authorized the Aurora company, as
the successor of those to whom the ordinances originally
ran, to grant unto the Joliet company the right to propel its
passenger cars, or have them propelled, over the lines of the
street railway.    We think this position untenable.    Not in-
frequently private individuals own the fee in the streets.
In such instances the owners are not in any way damnified
by the construction of a street railway in the streets, but
operating a commercial railroad in the streets is an addi-
tional servitude upon the fee.    Now, following the reasoning
of the appellees, if the ordinance and the statute enable the
street railway company to authorize the commercial railroad
company to use the lines of the street railway over which to
operate its cars without the permission of the city, it would
seem that the ordinance and statute so enable the street rail-
way company to confer such right without any reference to
the objections of private individuals who may own the fee
of the streets, and it would seem, in that event, that such
individuals would be without recourse.    The law is not so.
Where a corporation chartered to operate an interurban rail-

road desires to enter a city of this State and propel cars in and along the streets of the city for the purpose of transporting its passengers or freight into the city it must seek and obtain a license to do so from the city, subject to such reasonable rules and regulations as the municipality may find it necessary or proper to establish.

It is unnecessary to consider other points made by appellants.

The judgment of the Appellate Court and the decree of the circuit court are each reversed, and the cause will be remanded to the circuit court with directions to enter a decree dissolving the injunction and dismissing the bill for want of equity.            *Reversed and remanded, with directions.*

FARMER and VICKERS, JJ., took no part in the decision of this case.